UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ZACHARY SMITH, | ) |
| | ) |
|     Plaintiff, | )   Plaintiff's Motion For Expedited |
| | )   Temporary Restraining Order or |
| v. | )   Preliminary Injunction, with |
| | )   Incorporated Memorandum of Law |
| JOSEPH FITZPATRICK, Commissioner of | ) |
| Maine Department of Corrections; and SHAWN | ) |
| D. GILLEN, Chief Deputy and Acting | ) |
| Aroostook County Sheriff, | ) |
| | ) |
|     Defendants. | ) |

## PLAINTIFF'S MOTION FOR EXPEDITED TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Rules 7 and 65 of the Federal Rules of Civil Procedure, Plaintiff, Zachary Smith, moves the Court for an Expedited Temporary Restraining Order or Preliminary Injunction to prevent Defendants, Commissioner Joseph Fitzpatrick and Chief Deputy Shawn D. Gillen, from denying him necessary medical care to treat his co-occurring disorders, and otherwise discriminating against him on the basis of his disability, when he reports to prison on September 6, 2018.

## INTRODUCTION

Plaintiff, Zachary Smith, suffers from co-occurring disorders, including severe opioid use disorder, anxiety, and depression. Opioid use disorder is a chronic brain disease that can be deadly; an average of more than one Mainer per day dies of an opioid overdose. The standard of care for opioid use disorder is medication-assisted treatment ("MAT"), including treatment with methadone or buprenorphine. For more than five years, Mr. Smith has used MAT—specifically, physician-prescribed buprenorphine and related treatment—to keep his opioid use disorder in

remission. During that time, Mr. Smith has not experienced the symptoms of addiction, such as uncontrollable cravings and the progressive cycle of relapse and remission.

However, in 42 days, Mr. Smith must report to prison, where MAT is prohibited for all prisoners except pregnant women. Whether he is ultimately housed in the custody of the Maine Department of Corrections or the Aroostook County Sheriff's Department, Mr. Smith will be prevented from continuing his physician-prescribed buprenorphine treatment, absent an order from this Court. Without access to buprenorphine, Mr. Smith will suffer painful and psychologically damaging withdrawal and will be at a greater risk for relapse into addiction and potential overdose and death.

Mr. Smith meets all of the elements for a temporary restraining order ("TRO") or other preliminary injunctive relief. First, Mr. Smith is likely to succeed on the merits of his case. Commissioner Fitzpatrick and Chief Deputy Gillen have been made aware of the seriousness of Mr. Smith's condition and the importance of buprenorphine to his health and safety. Despite this notice, they have refused to assure to Mr. Smith that he will have access to buprenorphine or an equivalent medication while incarcerated. This refusal amounts to discrimination on the basis of disability in violation of the Americans with Disabilities Act, and deliberate indifference to a serious medical condition in violation of the Eighth Amendment.

Second, Mr. Smith will suffer immediate and irreparable harm absent an injunction. Defendants' policies would force Mr. Smith into acute withdrawal, which is physically painful, psychologically damaging, and accompanied by devastating long-term effects. The imminent prospect of withdrawal and potential relapse into active addiction has also triggered ongoing symptoms of anxiety for Mr. Smith.

Finally, the balancing-of-harms and public-interest prongs support preliminary injunctive relief. Providing Mr. Smith's prescribed medication would not harm Commissioner Fitzpatrick or Chief Deputy Gillen in any way, but the harm to Mr. Smith from withholding that medication would be catastrophic. Looking beyond the parties to this case, Mr. Smith's family has already lost his only sister to an opioid overdose, and they should not be forced to experience another tragedy. And, more broadly, Defendants' policies worsen the already deadly opioid crisis in the state by triggering relapse and increasing the chances of overdose upon release. The public interest favors enjoining those policies as applied to Mr. Smith, pending final decision in this case.

## FACTS

### I.    Opioid Use Disorder

Opioid use disorder is a chronic brain disease that presents a serious public health crisis in Maine. Fellers Decl. ¶¶ 3, 5.[1] An average of 1.14 people per day died of opioid overdoses in Maine in 2017—an 11 percent increase over the previous year. Fellers Decl. ¶ 5. Symptoms of opioid use disorder include "craving, increasing tolerance to opioids, withdrawal symptoms, and a loss of control." Fellers Decl. ¶ 3. Without treatment or other recovery, patients diagnosed with opioid use disorder are often unable to control their use of opioids. Fellers Decl. ¶ 4.

Like many other chronic diseases, genetic factors account for much of a person's vulnerability to addiction. *See* Fellers Decl. ¶ 9. Adverse childhood experiences present additional risk factors, alongside drug availability and peer influence. Fellers Decl. ¶ 10.

The standard of care for opioid use disorder is MAT (medication-assisted treatment), which refers to a treatment regimen that combines medication and counseling. Fellers Decl.

---

[1]  *See also* American Society of Addiction Medicine, Treating Opioid Addiction as a Chronic Disease, 1. November, 2014 (*available at* http://www.asam.org/docs/default-source/advocacy/cmm-fact-sheet---11-07-14.pdf) (last viewed July 25, 2018).

¶¶ 11-12; Conner Decl. ¶ 14. Although some patients can achieve remission without MAT, "most patients need [MAT] to achieve long-term recovery." Fellers Decl. ¶ 11. Two medications used in MAT are methadone and buprenorphine, which are approved by the U.S. Food and Drug Administration for the treatment of opioid use disorder. Fellers Decl. ¶ 12.[2] Both medications "bind tightly to the opioid receptor," so that illicit drugs cannot activate the receptor. Fellers Decl. ¶ 15. The medication element of MAT thus helps to prevent patients from experiencing "highs" from illicit drugs, to suppress withdrawal, and to reduce cravings. Fellers Decl. ¶ 14.

Both buprenorphine and methadone "have been clinically proven to reduce opioid use more than (1) no treatment, (2) outpatient treatment without medication, (3) outpatient treatment with placebo medication, and (4) detoxification only." Fellers Decl. ¶ 16 (citation omitted). Treatment with MAT produces "dramatically superior" results compared to other treatment options, "with studies showing improved retention in treatment, abstinence from illicit drugs, and decreased mortality." Fellers Decl. ¶ 13 (citation omitted).

## II.    **Mr. Smith's Medical History**

Mr. Smith has been diagnosed with co-occurring disorders, including severe opioid use disorder, attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), anxiety disorder, and severe depression.

Substance use disorder runs in Mr. Smith's family; his sister suffered from opioid addiction until her death by opioid overdose more than one year ago. Smith Decl. ¶ 15. Seeing his sister die from an opioid overdose confirmed for Mr. Smith "that addiction is a serious and deadly disease." Smith Decl. ¶ 15. Mr. Smith first became addicted to opioids at the age of 14, after experimenting with a family member's prescription medication. Smith Decl. ¶ 16. He

---

[2] *See also* U.S. Food and Drug Administration, Information about Medication-Assisted Treatment (MAT) (June 15, 2018) (available at https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm600092.htm) (last viewed July 25, 2018). Subutex is the brand name for buprenorphine.

quickly became addicted, and his opioid use disorder "made life unbearable" for him and his family. Smith Decl. ¶ 17. Mr. Smith "felt a constant need" to satisfy his opioid addiction and "spent each day" trying to find his next dose. *Id.* He felt that he "did not have control over [his] actions or [his] psychological state." *Id.* Mr. Smith's opioid use disorder led him to abuse prescription drugs, to rack up credit card debts, and to engage in theft. Smith Decl. ¶¶ 18, 19.

Mr. Smith has been in remission from these symptoms for more than five years, thanks to treatment from his physician, Dr. David Conner, who has prescribed MAT with buprenorphine tablets to treat his opioid use disorder. Conner Decl. ¶ 10-11. Mr. Smith's prescribed dosage is one and one-half tablets (12 mgs) of buprenorphine per day. Dr. Conner has also prescribed medication to treat Mr. Smith's co-occurring diagnoses, including clonazepam (for anxiety), gabapentin (for pain arising from scoliosis and herniated discs), sertraline (for depression), and Seroquel (also for depression). Conner Decl. ¶ 12.

Under this medication regimen, Mr. Smith's substance use disorder has remained in remission. Smith Decl. ¶ 6. He is able to function each day without cravings. He is in control of his symptoms and his cravings. He is safe. Smith Decl. ¶ 6. According to his mother, Mr. Smith has been a different person since beginning MAT. He is able to take an interest in life and to maintain remission from his substance use disorder. Lavasseur Decl. ¶ 8.

**III.**   **Defendants' Policies Will Force Mr. Smith into Imminent Withdrawal**

Because of a recent guilty plea to criminal charges, Mr. Smith understands that he will be required to report to Aroostook County jail on September 6, 2018, where current policies prohibit access to methadone or buprenorphine for most prisoners. Smith Decl. ¶ 7.[3]

---

[3] On July 19, 2018, Mr. Smith pled guilty to charges in a criminal case in Aroostook County Superior Court, Docket Nos. ARO-CD-CR-2018-00038. The terms of the plea agreement require 42 months' imprisonment, with all but 9 months and 1 day suspended. He is scheduled for a sentencing hearing on September 6, 2018, after

Mr. Smith is unsure at this time whether he will be transported to serve his sentence in a Maine Department of Corrections prison, or will remain in the Aroostook County Jail. Smith Decl. ¶ 8. Regardless, both facilities have policies against providing MAT, such as buprenorphine, to prisoners. Smith Decl. ¶ 9. Based on a prior pre-trial detention in February 2018, Mr. Smith knows that Aroostook County Jail has a policy of prohibiting medication-assisted treatment for prisoners. Smith Decl. ¶ 10. Additionally, after contacting the Maine Correctional Center, Mr. Smith was informed that the Maine Department of Corrections has a policy of prohibiting MAT for prisoners, except for pregnant women. Smith Decl. ¶ 11. These policies would force Mr. Smith into acute withdrawal from his medically necessary treatment.

On July 11, 2018, immediately after learning of Mr. Smith's situation, counsel for Mr. Smith sent a letter to Commissioner Fitzpatrick and Chief Deputy Gillen requesting assurance that Mr. Smith will be provided with buprenorphine or another comparable MAT medication during his time in their custody. Although the letter requested a response by noon on July 13, 2018, no response was received. Accordingly, Mr. Smith remains in fear that he will undergo forced withdrawal upon admission to jail or prison on September 6, 2018.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). In this case, the facts show that Mr. Smith is likely to succeed in showing that Defendants' policies violate the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Eighth Amendment to the United States

---

which it is his understanding that he must immediately report to Aroostook County Jail to begin serving his sentence.

Constitution; that Defendants' refusal to provide necessary medical care will cause Mr. Smith irreparable harm; and that the balance of hardships and the public interest strongly favor the issuance of the injunction.

**I.    Mr. Smith is Likely to Succeed On the Merits of His Statutory and Constitutional Claims**

**A.    Mr. Smith is Likely to Succeed On The Merits of His ADA Claim**

Mr. Smith is likely to succeed on the merits of his claim that denying him access to medical services because of his opioid use disorder constitutes unlawful discrimination under the Americans with Disabilities Act ("ADA").

The ADA prohibits a public entity from discriminating against a qualified individual with a disability on the basis of that disability. 42 U.S.C. § 12132. As instrumentalities of state and local government, Maine's jails and prisons qualify as a "public entit[ies]." 42 U.S.C. § 12131(1)(B); *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).

In order to state a claim against a public entity under Title II of the ADA, a plaintiff must allege three elements: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Buchanan v. Maine*, 469 F.3d 158, 170–71 (1st Cir. 2006) (quoting *Parker v. Universidad de Puerto Rico,* 225 F.3d 1, 5 (1st Cir. 2000)). Each of those elements is satisfied here.

**1.    Mr. Smith Is a Qualified Individual with a Disability**

Mr. Smith suffers from a severe and chronic disability and is qualified to receive medical services in prison.

As an initial matter, Mr. Smith is disabled under the ADA. Individuals who are in recovery from diagnosed substance use disorder are "qualified individuals with disabilities" under the Americans with Disability Act. *See* 42 U.S.C. §§ 12102, 12131(2). The term "disability" includes "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C.A. § 12102. By regulation, "[t]he phrase physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism." 28 C.F.R. § 35.108(b)(2).[4] "Unquestionably, drug addiction constitutes an impairment under the ADA." *A Helping Hand, LLC v. Baltimore Cnty., Md.*, 515 F.3d 356, 367 (4th Cir. 2008). Individuals perceived as suffering from opioid use disorder also qualify for protection. 42 U.S.C. § 12102(1)(C).

Although the ADA does not protect individuals who are current active users in illegal drugs, it does apply to individuals like Mr. Smith who are participating in a supervised drug rehabilitation program.[5] *See* 42 U.S.C. § 12210(a), (b); *Thompson v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002); *Collings v. Longview Fiber Co.*, 63 F.3d 828, 831-32 (9th Cir. 1995). Moreover, as a chronic brain disease, opioid use disorder "substantially limits" major life activities such as caring for oneself, eating, learning, reading, concentrating, thinking, communicating, and working, confirming that Mr. Smith qualifies for protection under the ADA. *See* 42 U.S.C. § 12102(2)(A).[6]

---

[4] *See also Bragdon v. Abbott*, 524 U.S. 624, 633 (1998); *Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014).

[5] Furthermore, the statute specifically prohibits denying individuals "health services, or services provided in connection with drug rehabilitation, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services." 42 U.S.C. § 12210(c). Considering that medical services and associated "drug rehabilitation" must be provided even to individuals experiencing current illegal drug use, such services surely must also be provided to Mr. Smith, who has been in remission for more than five years.

[6] In the alternative, prior cases have considered whether the United States Department of Justice has construed drug addiction as a *per se* disabling impairment pursuant to the ADA." *CRC Health Grp., Inc. v. Town of*

Despite his disability, Mr. Smith is otherwise qualified to receive the benefit of healthcare during his incarceration. As a prisoner, Mr. Smith is entitled to the necessities of life, including adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31-32 (1993); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Boyce v. Moore*, 314 F.3d 884-89 (7th Cir. 2002). When a state "so restrains an individual's liberty that it renders him unable to care for himself," government must provide basic human needs such as medical care. *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (quoting *Helling*, 509 U.S. at 34); *Brown v. Plata*, 563 U.S. 493, 510 (2011). In addition, Maine law guarantees that any person in Maine residing in a correctional or detention facility has a right to adequate professional medical and mental health care. 34-A M.R.S.A. §3031(2).  Every jail in Maine is required to provide medical and mental health services to prisoners in its custody. 03-201 C.M.R. Ch. 1, § IIa(K) ("Medical And Mental Health Services").

Mr. Smith expects to imminently report to prison on September 6, 2018, Smith Decl. ¶ 7, and, as such, he is a qualifying individual with a disability protected by the ADA, and eligible to receive medical care in prison for his disability.

2.    **Mr. Smith Will Be Denied the Benefits of Health Care Programs and Discriminated Against Because of His Disability**

Mr. Smith also satisfies the second and third elements for demonstrating an ADA violation, namely, that he was either denied benefits of the public entity's services or discriminated against because of his disability. *See Buchanan*, 469 F.3d at 170–71. By prohibiting the standard of care for opioid use disorder, *see* Fellers Decl. ¶¶ 10-18, Defendants

---

*Warren*, No. 2:11-CV-196-DBH, 2014 WL 2444435, at *10 (D. Me. Apr. 1, 2014). Such a theory provides additional support for holding Mr. Smith to be disabled under the ADA.

deny Mr. Smith the benefits of the facilities' health care programs and discriminate against him because of his disability.

The Americans with Disabilities Act provides that no qualified individual with a disability shall, by reason of that disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity. 42 U.S.C. § 12132. Under this standard, medical care is a service provided by jails and prisons from which disabled prisoners must not be excluded or subjected to discrimination. *Yeskey*, 524 U.S. at 210 (citing, *e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 552 (1984); *Olim v. Wakinekona*, 461 U.S. 238, 246 (1983)).

Defendants violate this mandate by withholding medical treatment for opioid use disorder, especially for a prisoner already receiving the standard of care upon admission, and, thus, eligible to benefit from the prison's continuity-of-care policies. For example, Maine DOC has medical policies to ensure continuity of care and continuity of medication at intake. *See* DOC Policy 18.5(VI), 18.07. Under these policies, DOC must continue a prisoner's current prescriptions upon admission until a meeting with facility medical staff, if "the prisoner appears to be stable." DOC Policy 18.07(VI)(L)(2). Maine DOC also has policies requiring treatment for chronic diseases. DOC Policy 18.5(VI). Applying these policies to Mr. Smith (who is currently stable) would require DOC to continue his current prescriptions upon admission and to provide a treatment plan for his chronic opioid use disorder.

Instead, Defendants withhold treatment for opioid use disorder and force patients to undergo painful and dangerous withdrawal. They do so even though MAT is the standard of care for opioid replacement therapy and forced withdrawal "is not medically appropriate for patients being treated with MAT." Fellers Decl. ¶¶ 11-18, 26. To the contrary, forced withdrawal disrupts

patients' treatment plan, "increases the risk of relapse into active addiction, and makes patients more likely to suffer from overdose and potential death." Fellers Decl. ¶ 26. In short, Defendants' policy withholds medical treatment for opioid use disorder, and thereby violates the ADA.

Defendants also violate the ADA by discriminating "amongst classes of the disabled." *Iwata v. Intel Corp.*, 349 F. Supp. 2d 135, 14849 (D. Mass. 2004) (citing *Olmstead v. L.C.*, 527 U.S. 581 (1999)). If Mr. Smith suffered from asthma, bipolar disorder, diabetes, epilepsy, fibromyalgia, gastritis, hypertension, or any number of other chronic health conditions requiring regular medication for treatment, Defendants would not hesitate to assure Mr. Smith that his medical needs would be met. But, because Mr. Smith suffers from opioid use disorder, he will be denied care. Opioid use disorder is no less serious than other chronic conditions like diabetes; to the contrary, hundreds of Mainers die each year from opioid use disorder. Fellers Decl. ¶¶ 5, 26, Conner Decl. ¶ 24. As Mr. Smith's physician has explained, "[j]ust as prisons must not withhold medially prescribed insulin for diabetic patients, they must not withhold medically necessary buprenorphine treatment—especially where, as here, the patient has relied upon that medication for years to treat a serious and deadly chronic disease." Conner Decl. ¶ 24.

This discrimination goes to the core of the ADA, especially during the ongoing opioid crisis. Indeed, the Department of Justice recently initiated an ADA investigation into a similar policy by the Massachusetts Department of Corrections.[7] In the policy under investigation, Massachusetts refuses to provide MAT even to prisoners whose opioid use disorder "has been identified as requiring" MAT prior to confinement—exactly the position of Mr. Smith. As the investigatory letter explained, "all individuals in treatment" for opioid use disorder are

---

[7] Attachment A, *Investigation of the Massachusetts Department of Correction Pursuant to the Americans with Disabilities Act*, United States Attorney for the District of Massachusetts (Mar. 22, 2018). The investigation is ongoing and the Massachusetts Department of Corrections has said that they will cooperate with the investigation.

"protected by the ADA, and [Massachusetts Department of Corrections] has existing obligations to accommodate this disability." *Id.* The same is true for the Maine Department of Corrections.[8]

Finally, Defendants' policies also discriminate against Mr. Smith by withholding reasonable accommodation for his disability. The definition of "discriminate" includes failure to make reasonable accommodations for a qualified individual with a disability. *See, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2nd Cir. 2003); 42 U.S.C. § 12112(b)(5)(A). Mr. Smith has requested a reasonable accommodation for his opioid use disorder—namely, medication-assisted treatment. Defendants' policies to instead require forced withdrawal do not qualify as reasonable accommodation. For this reason, too, the policies violate the ADA.

**B.      Plaintiff is Likely to Succeed On The Merits of His Eighth Amendment Claim**

Mr. Smith is likely to succeed on the merits of his Eighth Amendment claim that denying medication to treat his substance use disorder constitutes cruel and unusual punishment. Prison officials have an affirmative obligation under the Eighth Amendment to provide prisoners with the necessities of life, including medical care. *Farmer*, 511 U.S. at 832; *Helling*, 509 U.S. at 31-32; *Estelle*, 429 U.S. at 104. As courts across the country have consistently held, the Eighth Amendment "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884-89 (7th Cir. 2002).

To prevail in a constitutional challenge to inadequate medical care, a prisoner must show both that the risk of harm to the prisoner is objectively "serious" and that the defendant was

---

[8]   In another example, the U.S. Attorney's office for the District of Massachusetts recently settled an ADA lawsuit against a nursing facility that refused to accept a patient who was being treated for opioid use disorder. As explained in by the U.S. Attorney, the opioid epidemic is a deadly public health crisis, and "now more than ever, individuals in recovery must not face discriminatory barriers to treatment." *U.S. Attorney's Office Settles Disability Discrimination Allegations at Skilled Nursing Facility*, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF MASSACHUSETTS (May 10, 2018), https://www.justice.gov/usao-ma/pr/us-attorney-s-office-settles-disability-discrimination-allegations-skilled-nursing (last viewed July 25, 2018); *see also* Settlement Agreement, *United States v. Charwell Operating, LLC*, https://www.ada.gov/charlwell_sa.html (last viewed July 25, 2018).

subjectively "deliberately indifferent" to the risk of harm. *Farmer*, 511 U.S. at 834. The objective and subjective prongs are discussed in further detail below.

### 1. <u>Opioid Use Disorder is an Objectively Serious Illness</u>

Mr. Smith's opioid use disorder is an objectively serious illness, especially when considered as a co-occurring disorder alongside his depression, anxiety, and PTSD. Conner Decl. ¶¶ 7-12. Opioid use disorder is life-altering and potentially deadly, with Mr. Smith's own sister dying of the disease. Fellers Decl. ¶ 4, Levasseur Decl. ¶¶ 9-10.

Courts have held that addiction and withdrawal from opioids pose an "objectively serious" danger to inmates. *See, e.g.*, *Davis v. Carter*, 452 F.3d 686, 695-96 (7th Cir. 2006) (finding no dispute of the objective seriousness of delaying inmates access to their properly prescribed methadone treatment); *Foelker v. Outgamie County*, 394 F.3d 510, 513 (7th Cir. 2005) (holding that symptoms of withdrawal from methadone are serious); *Messina v. Mazzeo*, 854 F. Supp. 116, 140-141 (E.D. NY 1994) (refusing to dismiss cruel and usual punishment claim based on denial of access to methadone).[9]

Consistent with that authority, Mr. Smith's opioid use disorder qualifies as "objectively serious." Mr. Smith's own physician, Dr. Conner, has found his opioid use disorder to be "important and worthy of . . . treatment," including with medication-assisted treatment. *See Guiterrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (citations and internal quotations omitted); Conner Decl. ¶¶ 7-12. Failing to provide medication-assisted treatment could also cause the "unnecessary and wanton infliction of pain," *id.* (citation omitted), including bone and

---

[9] In another case, the court granted judgment to defendants who had already provided plaintiff with buprenorphine, but cautioned that "[i]f defendants had ignored plaintiff's request for assistance with detoxification, and left him to withdraw 'cold turkey' alone in his cell, then plaintiff's [constitutional] arguments would have validity." *McNamara v. Lantz*, 3:06-CV-93, 2008 WL 4277790 (D. Conn. Sept. 16, 2008). That is precisely the case here, where Defendants' policies would force Mr. Smith to withdraw "cold turkey," creating an objectively serious danger to his health.

joint aches, vomiting, diarrhea, hypothermia, hypertension, tachycardia (elevated heart rate), and psychological symptoms like depression and anxiety. Fellers Decl. ¶ 24.

Although Mr. Smith is currently in remission (thanks to his prescribed medication), a prisoner "does not have to await the consummation of a threatened injury" or "await a tragic event" to obtain injunctive relief. *Farmer*, 511 U.S. at 845 (citations and internal quotation marks omitted). It is enough that, absent injunctive relief, Defendant's policies will force Mr. Smith into imminent withdrawal—with the resulting objectively serious symptoms and potential relapse into active addiction.

**2.    Refusing to Provide Buprenorphine to Mr. Smith Constitutes Deliberate Indifference.**

Defendants are deliberately indifferent in refusing to assure Mr. Smith that he would be eligible for medication-assisted treatment in prison, and instead forcing Mr. Smith to undergo forced withdrawal upon his imminent admission to prison. Defendants have been personally notified of Mr. Smith's serious predicament, yet have remained silent and deliberately indifferent to his condition.

A prison must supply medical care to its prisoners "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Kosilek v. Spencer*, 774 F.3d 63, 114 (1st Cir. 2014) (citing *DeCologero*, 821 F.2d at 43). Consistent with this emphasis on "modern" standards, the case law on medication-assisted treatment have developed over the years. Back in the 1970s, when MAT was relatively new, courts were reluctant to hold jails accountable for providing only limited access to such therapy. *Inmates of Allegheny Co. Jail v. Pierce*, 612 F.2d 754, 761 (3rd Cir. 1979) (refusing to find "deliberate indifference" where jail only provides six days of methadone treatment in jail). Yet more recently courts have extended liability to cover "inordinate delay" in access to MAT. *See,*

*e.g.*, *Davis v. Carter*, 452 F.3d 686, 692-96 (7th Cir. 2006) (finding a genuine issue of fact whether the defendants had a practice of "inordinate delay" in providing methadone treatment to inmates and were otherwise deliberately indifferent to plaintiff's medical needs).[10]

Two significant developments happened in those intervening years: First, the Supreme Court announced its decisions in *Helling v. McKinney* in 1993 and *Farmer v. Brennan* in 1994, clarifying that corrections officials are obligated to prevent harm, including medical harm. *See Helling*, 509 U.S. at 36; *Farmer*, 511 U.S. at 836. Second, MAT has gained greater recognition as a safe, effective tool for treating drug addiction. MAT is now the clear standard of care for opioid use disorder. Fellers Decl. ¶¶ 11-18. For example, in 2010 the FDA found that buprenorphine and suboxone "have been studied in over 2,000 patients and shown to be safe and effective treatments for opiate dependence."[11] A review from the World Health Organization likewise found that "substitution maintenance therapy is one of the most effective treatment options for opioid dependence."[12] Even more recently, the President's Commission on Combating Drug Addiction and the Opioid Crisis found MAT is associated with reduced mortality following release from prison and with "other positive outcomes."[13] The American Society of Addiction Medicine, the leading professional society in the country on addiction

---

[10] The deliberate indifference is even more extreme in this case, where Defendants refuse to provide *any* methadone or buprenorphine—delayed or not.

[11] *See, e.g.*, U.S. Food and Drug Administration; *Subutex and Suboxone Approved to Treat Opioid Dependence*, *available at* http://www.fda.gov/Drugs/DrugSafety.

[12] Kastelic et al., OPIOID SUBSTITUTION TREATMENT IN CUSTODIAL SETTINGS: A PRACTICAL GUIDE, World Health Organization and United Nations Office of Drugs and Crime, 18 ("Substitution maintenance therapy is one of the most effective treatment options for opioid dependence."), http://www.unodc.org/documents/hiv-aids/OST_in_Custodial_Settings.pdf.

[13] Final Report 72 (2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf. The Commission citing a study finding that "individuals receiving MAT were 75% less likely to die of any cause and 85% less likely to die of drug poisoning in the first month after release." *Id.*

medicine, also recommends treatment with MAT for people with opioid use disorder in the criminal justice system.[14]

The suffering that Mr. Smith will endure if his buprenorphine is abruptly discontinued is as unnecessary as it is horrific. Studies show that withholding MAT in prison is potentially deadly. For example, one study from the Rhode Island Department of Corrections found that providing MAT in prison decreased overdose deaths immediately after release by 61 percent.[15] At the same time, overdose deaths in the state population dropped by 12 percent, in contrast to the upward spiral in neighboring states like Maine. *Id.* This study confirms that withholding medically necessary treatment is a major driver of overdose deaths and the opioid crisis.

Defendants violate the constitution even assuming that they plan to provide some medical care for Mr. Smith's other diagnoses. In denying him access to the standard of care for his opioid use disorder—care that was prescribed by his physician and that has kept him healthy— Defendants have drawn an arbitrary line that cannot be justified with reference to any valid medical or penological interest. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (choice of "easier and less efficacious treatment" for severe tooth pain can amount to deliberate indifference).

The Defendants need not engage in any particular heroics to prevent the harms of forced withdrawal. Mr. Smith is only asking that Defendants do something that they do every day for

---

[14]   Kyle Kampman & Margaret Jarvis, American Society of Addiction Medicine (ASAM) National Practice Guideline for the Use of Medications in the Treatment of Addiction Involving Opioid Use, 9 J. Addict. Med. 1, 8 (2015), available at https://www.asam.org/docs/default-source/practice-support/guidelines-and-consensus-docs/asamnational-practice-guideline-jam-article.pdf.

[15]   Green TC, Clarke J, Brinkley-Rubinstein L, et al. *Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System*. JAMA Psychiatry (April 2018), 2018;75(4):405–407. doi:10.1001/jamapsychiatry.2017.4614; see also, Judy George, *Opioid Treatment in Prison Saves Lives After Release*, MEDPAGE TODAY (February 14, 2018), https://www.medpagetoday.com/neurology/opioids/71153 (last viewed July 25, 2018) (summarizing the Green study).

thousands of prisoners: ensure his timely access to necessary and continuous medical care, prescribed by his physician, without which he will experience substantial physical and psychological suffering. Defendants know this risk and have the capacity to ensure it does not come to fruition. The Constitution will not tolerate their deliberate indifference to it.

## II.    Plaintiff Will Suffer Immediate Irreparable Injury If He Is Not Allowed Access to MAT While Incarcerated

Mr. Smith will suffer irreparable harm unless he is able to continue his maintenance MAT treatment incarcerated on September 6, 2018. "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Absent injunctive relief, Defendants' policies would force Mr. Smith into acute withdrawal with painful physical symptoms, devastating psychological consequence, and potential long-term addiction and relapse. *See* Fellers Decl. ¶¶ 24-25, Conner Decl. ¶¶ 18-22. No sum of money or subsequent equitable relief could compensate Mr. Smith for those harms.[16]

Withdrawal has serious physical and psychological effects. Symptoms of acute withdrawal include bone and joint aches, vomiting, diarrhea, excessive sweating, hypothermia, hypertension, tachycardia (elevated heart rate), and psychological symptoms like depression and anxiety. Fellers Decl. ¶ 24. The psychological consequences of withdrawal are potentially even more severe. Forced withdrawal can cause "serious psychological effects," especially for individuals with co-occurring disorders like Mr. Smith. Conner Decl. ¶ 20; Fellers Decl. ¶ 25.

---

[16] *See, e.g.*, *Chambers v. NH Prison,* 562 F. Supp. 2d 197, 202 (D.N.H. 2007) (denial of ready access to dental care caused irreparable harm); *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1013 (C.D. Ill. 2009) (delay of treatment for a lung infection constitutes irreparable injury due to reduction in life expectancy and negative impact on quality of life).

For such patients, "forced withdrawal may cause severe depression, suicidal ideation, and decompensation."[17] Fellers Decl. ¶ 25.

Withdrawal can also be life-threatening. "Discontinuation of MAT increases the risk of relapse into active addiction." Fellers Decl. ¶ 26. "Over 82% of patients who leave methadone treatment relapse to intravenous drug use within a year." Fellers Decl. ¶ 26. Forced withdrawal also places patients at greater risk of overdose and potential death. "Death is three times as likely for people out of treatment versus when in treatment." Fellers Decl. ¶ 26. The long-term effects of withdrawal include the risk of overdose "because the patient is no longer in remission and the patient's tolerance to narcotics is gone." Conner Decl. ¶ 21.

Mr. Smith is afraid of the serious physical and psychological consequences of withdrawal. He has experienced withdrawal in the past—most recently, during a 10-day period of pre-trial detention in Aroostook County Jail in February 2018. Smith Decl. ¶¶ 29-31. During his withdrawal, Mr. Smith recalls feeling like he would have done anything to gain access to opioids to end the unbearable symptoms. Smith Decl. ¶ 34. If someone had offered him heroin or oxycodone, he felt that he would have been powerless to refuse. *Id.* In light of these experiences and his sister's death from an opioid overdose, Mr. Smith remains afraid that his symptoms during withdrawal could lead to drug abuse, overdose, and death. Furthermore, because he is diagnosed with anxiety, Mr. Smith's expectation of imminent withdrawal has triggered current and ongoing symptoms of anxiety. Smith Decl. ¶ 12.

## III. <u>The Balance of Harms Strongly Favors the Grant of Emergency Injunctive Relief</u>

The irreparable, and potentially permanent, harm suffered by Mr. Smith absent relief greatly outweighs any potential budgetary or administrative harm claimed by defendants.

---

[17] In the psychological sense, "decompensation refers to a patient's inability to maintain defense mechanisms in response to stress, which can result in uncontrollable anger, delusions, mania, and other dangerous symptoms." Fellers Decl. ¶ 25; *see also* Conner Decl. ¶ 20.

Unlike the imminent pain and psychological distress that Mr. Smith would suffer absent the injunction, granting injunctive relief would impose no measurable harm on Defendants aside from the cost of providing medication-assisted treatment—which is extremely cost-effective.[18] And, in any event, Defendants cannot deny healthcare based on budgetary restrictions. *See, e.g. Boswell v. Sherburne County*, 849 F.2d 1117, 1123 (8th Cir. 1988).

Nor would Defendants suffer any cognizable administrative harm from the requested relief. The typical penological justification for denying prisoners MAT is that buprenorphine and methadone could be diverted and used illicitly.[19] But there are multiple strategies for preventing such diversion, many of which are already codified in Maine Department of Corrections' policy. *See* DOC Policy 18.07(VI). For example, proper management of "controlled medications," (such as buprenorphine) includes strict daily accounting and record-keeping of both facility-wide and individual usage, DOC Policy 18.07(VI)(G)(2-8), and "dose-by-dose" treatment to prevent diversion, 18.07(VI)(H)(1). Additional protections could include taking the medication "in view of the staff," with checks to ensure patients have taken their medication. *See* DOC Policy 18.07(VI)(H)(1)(I)(3). Furthermore, Defendant Maine Department of Corrections already provides MAT to qualifying pregnant female prisoners, and it would suffer little additional harm from providing MAT to Mr. Smith pending a final resolution of this lawsuit.

At the end of the day, underground markets in drugs are an age-old problem and, even with their existing policy of withholding MAT, Defendants cannot guarantee that heroin, fentanyl, and other illicit drugs will be unavailable in prison. *See, e.g.*, Smith Decl. ¶ 22 (stating

---

[18] Methadone "costs less than $5,000 per patient, per year," and buprenorphine "costs approximately $5,000 to $6,000 per year for the medication alone"—thus providing life-saving treatment at a reasonable cost. *See* Fellers Decl. ¶ 22.

[19] *See, e.g.*, Felice J. Freyer, *US investigating treatment of addicted prisoners in Mass.*, BOSTON GLOBE (March 29, 2018), https://www.bostonglobe.com/metro/2018/03/28/investigating-treatment-addicted-prisoners-mass/XUDpQI8tdOhB1QPUPljJyM/story.html (last viewed July 25, 2018).

that illicit drugs were available in jail for prisoners willing to pay). Given that reality, forcing Mr. Smith to withdraw from MAT is potentially life-threatening. Withdrawal could cause Mr. Smith to relapse into active addiction, to gain access to illicit drugs, and to overdose because of his decreased tolerance. Mr. Smith's sister died of a drug overdose, making relapse a particularly scary prospect for him. Accordingly, Mr. Smith's interest in safety outweighs any proffered penological interest.

**IV.    The Public Interest Favors Emergency Injunctive Relief**

The public interest also favors Mr. Smith's requested injunctive relief. Defendants' policy of denying MAT, even to people with existing prescriptions, provides one more barrier to effective treatment for Maine's opioid crisis. Opioid use disorder is already a serious public health crisis in Maine, with an average of 1.14 overdose death per day reported in 2017. Fellers Decl. ¶ 5.  Mr. Smith's family has already suffered major tragedy. Levasseur Decl. ¶¶ 9-10. Defendants' policies worsen that crisis by disrupting effective treatment and making relapse and potential overdose more likely. Providing injunctive relief for Mr. Smith would be one small step towards continuous treatment for vulnerable prisoners who suffer from opioid use disorder, and would thus serve the public interest in combating the opioid crisis.

## CONCLUSION

For the reasons presented, this Court should issue a Temporary Restraining Order requiring Defendants to provide buprenorphine or an equivalent medication to Mr. Smith upon admission to jail or prison on September 6, 2018.

Respectfully submitted,


Dated:  July 26, 2018                    /s/ Zachary L. Heiden
                                         Zachary L. Heiden
                                         American Civil Liberties Union of Maine
                                         Foundation
                                         121 Middle Street, Suite 200
                                         Portland, ME 04103
                                         (207) 619-6224
                                         *heiden@aclumaine.org*

                                         /s/ Emma E. Bond
                                         Emma E. Bond
                                         American Civil Liberties Union of Maine
                                         Foundation
                                         121 Middle Street, Suite 200
                                         Portland, ME 04103
                                         (207) 619-8687
                                         *ebond@aclumaine.org*

                                         Counsel for Plaintiff Zachary Smith


.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that she has electronically filed this date the foregoing

Plaintiff's Motion for Expedited Temporary Restraining Order or Preliminary Injunction and

Incorporated Memorandum of Law with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record. This filing is available for

viewing and downloading from the ECF system.

Dated:  July 26, 2018                     /s/ Emma E. Bond
                                          Emma E. Bond
                                          American Civil Liberties Union of Maine
                                          Foundation
                                          121 Middle Street, Suite 200
                                          Portland, ME 04103
                                          (207) 619-8687
                                          *ebond@aclumaine.org*

                                          Counsel for Plaintiff Zachary Smith